UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Aspex Eyewear, Inc.,
Contour Optik, Inc.,
Plaintiffs

02 Civ. 6195 (SCR)

v.

MEMORANDUM DECISION
AND ORDER

Altair Eyewear, Inc.,
Defendant

---

## I. Background

### A. Factual History

Aspex Eyewear, Inc. ("Aspex") is a Delaware corporation engaged in the distribution of eyewear. Contour Optik, Inc. ("Contour"; Aspex and Contour are collectively referred to herein as the "Plaintiffs") is a Taiwanese corporation owned by the family of Richard and David Chao, who are the named inventors of the patents at issue in this case.

Altair Eyewear, Inc. ("Altair" or "Defendant") is a California corporation also engaged in the distribution of eyewear. Altair is a wholly-owned subsidiary of Vision Services Plan ("VSP"), which is also a California corporation.

Aspex derives all of its rights with respect to the resale of bridge mounted magnetic eyewear from its Canadian sister company, Chic Optik ("Chic"). Both Chic and Aspex are owned and operated by the Ifergan family. Nonu Ifergan, a resident of Montreal, Canada, is the President of both companies. Thierry Ifergan, Nonu Ifergan's son, is the Executive Vice President of Aspex and a resident of Florida, Aspex's principal place of business.

This case involves eyeglass technology, specifically the way in which secondary sunglass frames attach to primary (i.e. prescription) eyeglass frames. For years, the prevailing technology involved a form of "clip-ons," which essentially used mechanical hooks to attach a second pair of lenses directly to the primary eyeglass lenses. Plaintiffs characterize this approach as problematic in that it is cumbersome and likely to result in scratched lenses. As a result, Plaintiffs patented a new approach that relied on magnetic attraction to attach the secondary lens frame to the primary lens frame.

In particular, Plaintiffs obtained three patents, which they claim have been infringed by Defendants: 1) United States Patent No. 5,737,054, entitled "Auxiliary Lenses for Eyeglasses" (the "'054 Patent"), which was issued by the PTO on April 7, 1998; 2) United States Patent No. 6,012,811, entitled "Eyeglass Frames with Magnets at Bridges for Attachment" (the "'811 Patent"), issued on January 11, 2000; 3) United States Patent Number 6,092,896, entitled "Eyewear With Magnets" (the "'896 Patent"), issued on July 25, 2000 (the '054 Patent, '811 Patent and the '896 Patent are collectively referred to herein as the "Patents-in-Suit"). Together, the Patents-in Suit describe and claim the use of magnets to connect an auxiliary spectacle frame containing, for example, sunglass lenses, to a primary spectacle frame.

The '054 Patent discloses a pair of primary spectacle frames with a magnet in the bridge of the primary spectacle frame; an auxiliary spectacle frame with a projection extending rearward from the bridge; and a second magnet at the projection. The projection from the bridge of the auxiliary frame extends over the bridge of the primary frame, and the magnets in each couple together, thereby securing the auxiliary frame to the primary frame. In Plaintiff's view, the '054 Patent's specification is only one example of many possible embodiments of the invention, and therefore numerous changes can be made to the construction, combination and arrangement of parts without departing from the spirit and scope of the invention.

The '811 Patent is in part a continuation of the '054 Patent. The '811 Patent includes methods and an apparatus for "easily, firmly and elegantly" attaching auxiliary frames to primary frames, using "magnetic members" at the bridges of frames. The patent includes several methods, or "embodiments," for attaching the frames at the bridge. Again, Plaintiffs contend that those skilled in the art would appreciate that these embodiments are for explanatory purposes, and that the invention extends beyond these embodiments.

The '896 Patent, a continuation of the '811 and a continuation-in-part of the '054, describes methods and apparatus to easily, firmly and elegantly attach auxiliary eyeglass frames to primary frames, using magnetic members at the bridge of frames. The bridge of the auxiliary frame contains a magnetic member, which couples to another magnetic member at the bridge of a second frame. The magnetic members at the bridge are much less conspicuous than magnets disposed on the plane of the lenses, thus enhancing aesthetic appeal. Moreover, the present invention is easier to manufacture, more secure in attachment than prior art approaches, and attaches more easily to the primary frame.

The Defendant produces a product that also utilizes magnetic attraction to attach a second pair of lenses to the bridge of a pair of eyeglasses. Although it is not entirely clear from the parties' descriptions of the facts of this case, it appears that the Defendant's products are rimless. In Defendant's product, the lenses are apparently held together by pins and/or screws—not rims surrounding the lenses.

Specifically, Plaintiffs claim that the Defendant has infringed claim 1 of the '054 Patent, claims 1-3, 5, 6, 9, 10, 12-14, 22-24, 26-28, and 31-33 of the '811 Patent, claims 13-22 of the '896 Patent. Defendant argues that Plaintiffs' patents do not cover Defendant's product and, moreover, notes that the '054 Patent was not the first patent to disclose the use of magnets to attach auxiliary spectacle frames to primary spectacle frames. Nor, in Defendant's view, was the '054 Patent the first patent to disclose attaching auxiliary spectacle frames to primary spectacle frames using magnets at the bridge.

**B. Procedural History**

The Plaintiffs filed their complaint in this action in August 2002, alleging violations of United States patent laws, 25 U.S.C. §§271, 281, 283. They filed an amended complaint later that month, which the Defendant answered in September 2002. Along with its answer, the Defendant made counterclaims against both Plaintiffs. The case was initially assigned to the docket of Judge Koeltl, but was reassigned to this court in September 2003.

In August 2004, the Defendant moved for partial summary judgment that Plaintiff Aspex does not have standing to sue for infringement of the Patents-in-Suit. Shortly thereafter, the Plaintiffs filed a motion, pursuant to Rule 19 of the Federal Rules of Civil Procedure, to add VSP as a defendant in this matter. In a memorandum decision and order, dated March 7, 2005, this

court denied both the Defendant's motion for partial summary judgment and the Plaintiffs' motion to add an additional defendant.

On March 14, 2005, the Plaintiffs filed a motion to exclude the testimony of Ogden H. Webster ("Webster"), one of the Defendant's experts. On March 21, 2005, Plaintiffs filed a motion to exclude the testimony of another expert witness for the Defendant, Allen Leck ("Leck"). The Defendant submitted oppositions to both motions and the Plaintiffs submitted replies.

The parties filed their claim construction briefs at approximately the same time. Defendant filed its opening brief on claim construction on or about February 28, 2005, while the Plaintiffs filed their opening claim construction brief on or about March 2, 2005. The parties submitted their reply claim construction briefs on or about March 18, 2005, and Plaintiffs submitted a sur-reply on or about April 15, 2005. A Markman hearing was held in this matter on July 28, 2005. In response to the court's requests, the parties submitted additional briefing after the hearing. This order follows.

## II. Analysis

### A. Legal Background

Patent infringement is the unauthorized making, using, selling, offering to sell, or importing into the United States of any patented invention during the term of the patent. 35 U.S.C. § 271(a). Patent infringement analysis involves two steps. In the first step the court determines the proper construction of the patent claims by establishing, as a matter of law, the scope and boundaries of the subject matter that is patented, and in the second step the trier of fact compares the properly construed claims to the allegedly infringing device(s) and determines whether there has been an infringement. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370, 384-85 (1996).

The claims of a patent are the numbered paragraphs at the end of the patent that define the scope of the invention and thus the scope of the patentee's right to exclude others from making, using, or selling the patented invention. *See Astrazaneca AB v. Mutual Pharmaceutical Co.*, 384 F.3d 1333, 1336 (Fed. Cir. 2004). The purpose of construing patent claims is to define the scope of the coverage of the claim by interpreting the words and terms of art used as they would be understood at the time the claim was made by one reasonably skilled in the relevant art. Claim construction "is the judicial statement of what is and is not covered by the technical terms and other words of the claims." *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001). *See also United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997), cert. denied, 522 U.S. 950 (1997).

In construing claims, the words of a claim "are generally given their ordinary and customary meaning." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention. *See Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004). Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, courts should look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Innova*, 381 F.3d at 1116. Those

sources include various forms of "intrinsic" evidence, such as the words of the claims themselves, the specification, and the prosecution history, as well as various forms of "extrinsic" evidence, including expert and inventor testimony, dictionaries and treatises. *See id.*; *Markman*, 52 F.3d at 979-80.

In a recent decision, the Federal Circuit clarified the principles by which district courts should approach claim construction analysis, including with respect to the proper use of the various kinds of intrinsic and extrinsic evidence. *See Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005). In *Phillips*, the court looked first to the language of the claims themselves, considering the meaning of particular claim terms, the context in which terms are used in the asserted claims, and other claims of the patent in question, since claim terms are normally used consistently throughout a patent. *See id.* at 1314-15.

Second, the court emphasized that "claims must be read in view of the specification," which the court described as "highly relevant to the claim construction analysis." *Id.* at 1315 (internal quotations omitted). In fact, the Federal Circuit explained that the specification is "'usually…dispositive…[and] the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics*, 90 F.3d at 1582). For these reasons, the Federal Circuit confirmed that it is "entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Phillips*, 415 F.3d at 1317.

Third, the court stated that, in addition to consulting the specification, a district court should also consider the patent's prosecution history, if it is in evidence. *See id.* (internal quotation omitted). The court explained that the prosecution history is potentially useful because, like the specification, it was "created by the patentee in attempting to explain and obtain the patent." *Id.*. That said, the court cautioned that, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id*.

Finally, the Federal Circuit confirmed that district courts are authorized to rely on extrinsic evidence. In particular, the court noted that dictionaries and treatises can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention, and that expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field. *Id.* at 1318.

At the same time, however, the Federal Circuit warned that extrinsic evidence is generally less reliable than the patent and the prosecution history in construing claim terms, for several reasons: extrinsic evidence was not created at the time of patent prosecution for the purpose of explaining the patent's scope and meaning; extrinsic publications may not be written by or for skilled artisans and therefore may not reflect the understanding of a skilled artisan in the field of the patent; expert reports and testimony are generated at the time of and for the purpose of litigation and thus can suffer from bias; there is a virtually unbounded universe of potential extrinsic evidence of some marginal relevance that could be brought to bear on any claim construction question; and undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the indisputable public records consisting of the claims, the specification and the prosecution history, thereby undermining the public notice function of patents. *See id.* at 1318-19 (internal quotations omitted). For these

reasons, the court stressed that extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id*. at 1318 (internal quotations omitted).

### B. Claim Construction of Disputed Terms[1]

#### 1. '054 Patent

##### i. Relevant Claim Language And Disputed Terms

Claim 1:
> "An eyeglass device comprising:
> a primary (respectively auxiliary) spectacle ***frame* for *supporting (respectively auxiliary) primary lenses therein***, said primary (respectively auxiliary) spectacle
> frame including a ***middle bridge portion***,
> a first magnetic member secured in said middle bridge portion of said primary spectacle frame,
> an auxiliary spectacle frame for supporting auxiliary lenses therein, said auxiliary spectacle frame including a middle bridge portion having a ***projection*** extended therefrom for extending over and for engaging with said middle bridge portion of said primary spectacle frame, and
> a second magnetic member secured to said projection of said auxiliary spectacle frame for engaging with said first magnetic member of said primary spectacle frame and for allowing said auxiliary spectacle frame to be ***attached*** to said primary spectacle frame with only one hand by a user."

##### ii. Frame

The Plaintiffs contend that the term "frame" should be construed as: the entirety of the frame with the exception of the lenses and including the lens rims (if provided), the frame magnetic members, the nose bridge, and the arms. Crucially, Plaintiffs insist that the term "frame" should be read to encompass both rimmed and rimless eyeglasses, such that a frame made up only of pins or screws is as much a "frame" as one taking the form of a rim around the lenses. The Defendant, on the other hand, argues that a "frame" is an eyeglass device that includes, at least, a bridge *and* rims. Defendants insist that the rims have to at least partially surround the lenses and, if the rims do not completely encircle the lenses, the frame must include some sort of rim wire to hold the lenses in place.

Defendant's argument, which focuses on the language of the claim itself, is more faithful to the principles of claim construction outlined in *Phillips*, and is more persuasive to this court. As Defendant points out, the relevant claim describes the frame as supporting lenses "therein"

---

[1] This court derived its list of disputed terms primarily from Plaintiffs' Opening Claim Construction Brief, which indicated that its list was derived, at least in part, in consultation with the Defendant. Plaintiffs provided a preferred construction for each of the terms contained in their Opening brief but, for whatever reason, Defendant did not provide an alternative construction for each of these terms in its papers. Nevertheless, in this decision, the court will construe each of the terms listed as in disagreement in Plaintiffs' Opening brief, with the exception of those terms regarding which the parties have come to an agreement since the Markman hearing.

5

and "including" a middle bridge portion. Because the claim discloses a frame that supports lenses "therein," the frame must be capable of supporting the lenses *in* the frame, and only a frame with rims is capable of supporting lenses *in* the frame. In addition, the claim language requires that the frame "includ[e]" a middle bridge portion, which indicates that the frame must also have other components, i.e. rims. Therefore, considering the term "frame" in the context in which the term is used in the asserted claims, which the Federal Circuit instructed district courts to do at the outset of their claim construction analysis, *see Phillips*, *supra*, strongly compels the finding that the term "frame" includes some kind of rim surrounding the lenses.

This conclusion is supported by an analysis of the specification. Specifically, the Patents-in-Suit are devoid of any language disclosing any kind of "frames" other than those containing rims. On the contrary, the specification of the '054 Patent discloses "an eyeglass device in accordance with the present invention comprises a primary spectacle frame **10** for supporting primary lenses therein," col. 1, l. 66 – col. 2, l. 2, and explains that "an auxiliary spectacle frame **20** is provided for supporting the auxiliary lenses therein," col. 2, ll. 7-9; crucially, the primary spectacle frame **10** in Figures 1 and 2 and the auxiliary spectacle frame **20** in Figures 1-3 of the '054 Patent all include rims. In fact, each of the over thirty diagrams and figures in the Patents-in-Suit disclose eyeglass devices that clearly include rims.

Plaintiffs respond by pointing to a series of generalized disclaimers explaining that the specifications provided in the Patents-in-Suit are not intended to foreclose other variations that are within the scope of the claims. *See*, *e.g.*, '054 Patent, col. 2, ll. 56-62 ("Although this invention has been described with a certain degree of particularity, it is to be understood that the present disclosure has been made by way of example only and that numerous changes in the detailed construction and the combination and arrangement of parts may be resorted to without departing from the spirit and scope of the invention hereinafter claimed."). Although this court is mindful of the Federal Circuit's repeated admonition to avoid "reading limitations from the specification into the claim," *Phillips*, 415 F.3d at 1323,[2] Plaintiffs' generalized statements are nevertheless unpersuasive, for several reasons.

First, Plaintiffs have pointed to various places in the Patents-in-Suit in which the patentee described specific ways in which the disclosed inventions could be changed. *See* '811 Patent, col. 6, ll. 33-35 (acknowledging that an illustration shows a magnetic member with only one or two parts, but explaining "that a magnetic member can have more than two parts"); '896 Patent, col. 6, ll. 50-53 (same); '811 Patent, col. 8, l. 65 – col. 9, l. 1 ("Different embodiments in the present invention can be combined in different ways. For example, the vertical flange can be combined with the lateral flanges. The hinge can be combined with the lateral flanges."); '896 Patent, col., 9, ll. 22-25 (same).[3] The absence of any specific statement about the possibility of frames with or without rims argues against construing the term "frames" to include rimless frames. Generalized disclaimers provide no guidance in defining which variations are within the

---

[2] That said, this court agrees with the Federal Circuit that the distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice. *See Phillips*, 415 F.3d at 1323 (citing *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186-87 (Fed. Cir. 1998) ("there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification")).

[3] Admittedly, two of the Patents-in-Suit also contain language explaining that, "different types of auxiliary frames and different forms of primary frames, individually, is also a different embodiment of the present invention." '811 Patent, col. 9, ll. 7-9; '896 Patent, col. 9, ll. 31-33. But this language simply begs the question of whether "frames" can be rimless. It says nothing about the ways in which frames can differ from each other, and can easily be read as allowing for frames with rims made up of different materials.

scope of claim language and which are not. *See Les Traitments Des Eaux Poseidon v. Kwi, Inc.*, 135 F. Supp. 2d 126, 135 (D. Mass 2001) (boilerplate language in the specification asserting that the general description is non-restrictive carries "little weight"). Therefore, the court finds that the specifications in the '054 Patent and the other Patents-in-Suit clearly suggest that "frames" include rims.

In addition, Plaintiffs argue that this court should be persuaded by other district courts that have rejected many, if not all, of Defendant's arguments and adopted Plaintiffs' interpretation of the term "frame" in the '054 Patent and in related patents. *See Aspex Eyewear, Inc. and Contour Optik, Inc. v. E'Lite Optik, Inc.* (Dist. Ct. Nev. CV-S-00-1116-PMP (PAL)) (finding that the term "frame" in both the '054 and '811 Patents refers to both rimmed and rimless spectacles because it is commonly understood to refer to some structures that surround an object and other structures that connect parts but do not surround anything); *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, (C. Dist. Cal. CV 01-10396 (Order Construing Claims, p. 37-38, February 14, 2003) (refusing to construe the term "primary frame" (in a different patent) as requiring a pair of lens rims of a continuous eye-loop type because the claim language is broader and the specification does not require a particular type of lens rim construction). Although this court has reviewed these decisions, the court is not persuaded by them.

First, these decisions were made before the Federal Circuit clarified the principles of claim construction in *Phillips*. Second, the unwillingness of the Federal Circuit to itself give any deference to the claim construction findings of District Courts further dissuades this court from giving significant precedential value to judgments of its colleagues. *See Cybor Corp. v. FAS Techs.*, 138 F.3d 1448, 1455 (Fed. Cir. 1998) (the Supreme Court endorsed this court's role in providing national uniformity to the construction of a patent claim, a role that would be impeded if we were bound to give deference to a trial judge's asserted factual determinations incident to claim construction). Evidently, the Federal Circuit believes that it is its responsibility—not the collective responsibility of federal courts—to ensure uniformity of claim construction, and the Federal Circuit will likely have the opportunity to bring uniformity to the construction of the claim language at issue in this case.[4]

Therefore, the court finds that a "frame" is an eyeglass device that includes, at least, a bridge and rims.

### iii. Supporting (respectively auxiliary) primary lenses therein

Not surprisingly, both Plaintiffs and Defendant construe the phrase "Supporting (respectively auxiliary) primary lenses therein" in ways that are consistent with their differing interpretations of the term "frame." Plaintiffs interpret the phrase to mean "the lenses are

---

[4] Plaintiffs and Defendant support their arguments with testimony from outside experts and other sources. For example, Plaintiffs point to the Defendant's marketing materials, which allegedly refer to frames as "frames" even when they are rimless, and to testimony by Richard Chao, one of the inventors. The Defendant supports its argument with expert testimony from Allen Leck, who claims that the ordinary meaning of the term "frame" to a person having skill in the eyeglasses industry is that it should include at least a bridge and rims. Plaintiffs have filed a motion to exclude Mr. Leck's testimony. The court finds none of this evidence to be particularly helpful, particularly in light of the intrinsic evidence, which provides the basis for this court's interpretations. As such, the court declines to reach Plaintiffs' motion to exclude Mr. Leck's testimony at this time.

secured to the frames, whether rimmed or rimless," while the Defendant would require lenses secured to frames that include rims.

Consistent with the court's construction of the term "frame," which was based in part on its construction of the word "therein," the court interprets "Supporting (respectively auxiliary) primary lenses therein" to mean that "lenses are secured to frames that include rims."

### iv. Middle bridge portion

Plaintiffs argue that "middle bridge portion" means "the middle part of the eyeglasses spanning the nose." The Defendant has not indicated any disagreement with this interpretation.

The court finds that "middle bridge portion" means "the middle part of the eyeglasses spanning the nose."

### v. Projection

Plaintiffs interpret "projection" to mean "any portion of the auxiliary bridge which extends toward the primary bridge for the purpose of going over and engaging with the primary bridge." The Defendant agrees with this interpretation, but requests that the court specifically note that a "projection" is not limited to a single-component straight piece, but that it can also be a multi-component, bent or even U-shaped structure. Plaintiffs object to Defendant's request that the term be read to include "multi-component structures."[5]

The court finds that the term "projection" means "any portion of the auxiliary bridge which extends toward the primary bridge for the purpose of going over and engaging with the primary bridge" and agrees with Defendant that a "projection" can also be a multi-component, bent or even U-shaped structure.

Nothing about the term "projection" indicates that a "projection" could not be a multi-component, bent or U-shaped structure, nor does the other claim language suggest that the term "projection" should be limited as Plaintiffs request. If an apparatus claim recites a general structure (e.g., a noun) without limiting that structure to a specific subset of structures (e.g., with an adjective), the Federal Circuit generally construes the claim to cover all known types of that structure that are supported by the patent disclosure. *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). Notably, the patentee need not "describe in the specification every conceivable and possible future embodiment of his invention." *See Ccs Fitness v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (internal citations omitted).[6]

Here, the court finds no reason to limit the term projection to the kind of single-component structure described in the specification. *See id*. at 1364-65 (reversing the district court's decision to interpret the term "reciprocating member," in a patent involving fitness equipment, as not comprising a multi-component structure simply because the embodiments did not include such a structure). Therefore, the court construes "projection" to mean "any portion of the auxiliary bridge which extends toward the primary bridge for the purpose of going over

---

[5] It is not entirely clear to the court whether Plaintiffs also object to Defendant's request insofar as it requests that the court note that the term also comprises bent and U-shaped structures. The court will presume that Plaintiffs do object.

[6] This, of course, assumes that the term in question is not a means-plus-function claim limitation. *See infra*. In this case, neither Plaintiffs nor the Defendant, nor the court, would construe the term "projection" as a means-plus-function claim limitation.

and engaging with the primary bridge." The court adds that, all things being equal,[7] the term could comprise a multi-component, bent or U-shaped structure.

### vi. Attached

Plaintiffs construe the term "attached" to mean "fastened or connected, by way of magnetic engagement." Defendant objects to limiting the term's meaning to fastening or connecting by magnetic engagement.

The court agrees with Plaintiffs. In the relevant claim language, the term "attached" is found in the following phrase: "a second *magnetic* member secured to said projection of said auxiliary spectacle frame for engaging with said first *magnetic* member of said primary spectacle frame and for allowing said auxiliary spectacle frame to be ***attached*** to said primary spectacle frame with only one hand by a user" (emphasis added). The references to "magnetic" members clearly imply that the term "attached," read in context, refers to magnetic attachment.

Therefore, the court construes the term "attached" as "fastened or connected, by way of magnetic engagement."

## 2. '811 Patent

### i. Relevant Claim Language And Disputed Terms

**Claim 1:**
> An eyeglass device comprising:
> A first frame including
> > ***two retaining mechanisms*** for ***supporting a pair of lenses***, and ***defining a frontal plane***,
> > a bridge connecting the two retaining mechanisms and ***holding the two retaining mechanisms together***, and
> > a first magnetic member at the bridge for magnetically coupling to another magnetic member at the bridge of a second frame;
> such that when coupled,
> > the ***two frames are attached together***,
> > due to the locations of the magnetic members, one of the frames is restricted from moving downwards relative to the other frame, and
> > the two magnetic members are ***coupled at a surface*** that is ***not parallel to the frontal phase [sic, plane]***.[8]

**Claim 2:**
> An eyeglass device as recited in claim 1 wherein the coupling occurs at a coupling surface on the second frame that is substantially perpendicular to the frontal plane.

---

[7] It, of course, goes without saying that the fact that a "projection" could be a multi-component, bent or U-shaped structure does not imply that every multi-component, bent or U-shaped structure necessarily constitutes a "projection."

[8] Plaintiffs and Defendant appear to agree that the phrase "frontal phase" was erroneously used instead of "frontal plane," which is mentioned earlier in Claim 1. This mistake is made elsewhere in the Patents-in-Suit. Wherever the parties agree that "phase" was erroneously used instead of "plane," the court simply uses the term "plane."

9

**Claim 12:**
>An eye glass device as recited in claim 1 wherein:
>The bridge of the first frame includes a ***U-shaped structure having two arms***; and
>the magnetic member at the first frame is disposed at least on one of the arms;
>such that magnetic coupling occurs when the bridge of the second frame is
>***sandwiched between*** the arms of the U-shaped structure.

**Claim 22:**
>An eye glass device comprising:
>a bridge connecting two retaining mechanism[9] and holding them together, with the two mechanisms supporting a pair of lenses of a first frame; and
>a magnetic member at the bridge for magnetically coupling to another magnetic member at the bridge of a second frame;
>such that:
>the two retaining mechanisms defines a frontal plain;
>and
>when coupled,
>the two frames are attached together,
>***due to the location of the magnetic members***, one of the frames is restricted from moving downwards relative to the other frame; and
>the two magnetic members are coupled at a surface that is not parallel to the frontal phase [sic, plane]

### ii. Retaining mechanisms

Plaintiffs argue that the term "retaining mechanisms" should be construed as any structure that keeps the lenses in a fixed place or position, whether rims, pins, screws or other mechanisms securing the lenses. The Defendant contends that the term should be restricted to the structure disclosed in the patent's specification—rims—and their equivalents that perform the identical function of "supporting" and "defining."[10]

Under U.S. Patent law, "means-plus-function" claims must be construed in a way that is consistent with the structure disclosed in the patent's specification, *see* 35 U.S.C. § 112, ¶6, and, in this case, the specifications for each of the Patents-in-Suit depict the retaining mechanisms in the form of rims.[11] Defendant argues that "retaining mechanism" is a means-plus-function claim limitation because there is no common meaning of the phrase in the industry, and because the claim limitation is described only in terms of its function and not its mechanical structure (i.e. supporting lenses and defining a plane). *See Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1215 (Fed. Cir. 1998) (construing a term as a "means-plus-function" claim limitation in light of "subsequent functional language"). Plaintiffs disagree that "retaining mechanism" is a means-plus-function claim limitation for the purposes of § 112 ¶6.

---
[9] The actual claim language erroneously excluded the letter 's.'
[10] To the extent Plaintiffs dispute that the structure disclosed in the specification includes rims, the court disagrees. The court finds, based on its reading of the specification and every figure or drawing contained therein, that the retaining mechanisms disclosed in the specification clearly includes rims.
[11] As well as to any equivalents, but the issue of equivalents is not before the court at this time.

As Plaintiffs correctly point out, there is presumption against construing "retaining mechanism" as a means-plus-function claim, because the relevant term at issue here does not include the word "means." *See Phillips*, 415 F.3d at 1311 (citing *Personalized Media Communs., LLC v. ITC*, 161 F.3d 696, 703-04 (Fed. Cir. 1998)). That said, the presumption is rebuttable, *see Phillips*, 415 F.3d at 1311, and this court finds that the presumption has been rebutted in this case.

Means-plus-function claiming applies only to purely functional limitations that do not provide the structure that performs the recited function. *See Watts v. XL Sys., Inc.*, 232 F.3d 877, 880-81 (Fed. Cir. 2000). In this case, the term "retaining mechanism" is a purely functional limitation that provides no indication as to the nature of its structure, if any. Rather, the relevant claim language refers to "two retaining mechanisms for supporting a pair of lenses, and defining a frontal plane"—language which describes only what the retaining mechanisms do, namely supporting a pair of lenses and defining a frontal plane. As such, "retaining mechanism" is a means-plus-function claim within the meaning of § 112 ¶6.

Plaintiffs argue that the Federal Circuit's analysis in *Phillips* compels a contrary result but, in fact, *Phillips* is consistent with this court's decision. In *Phillips*, the Federal Circuit considered whether the term "baffles"[12] was a means-plus-function claim, and ultimately found that it was "not a purely functional placeholder in which structure is filled in by the specification" and, thus, not within the parameters of § 112 ¶6. *See* 415 F.3d at 1311. The court based its conclusion on the fact that the claim characterized the baffles as made up of "steel" and "extending inwardly" from the steel shell walls, "which plainly implie[d] that the baffles are structures." *Id.*. In this case, in contrast, the relevant claim language contains no language analogous to "extending inwardly" that in any way describes the retaining mechanism's physical structure. As such, the claim language in this case compels a different result than that at issue in *Phillips*.[13]

Therefore, the court finds that "retaining mechanism" means "a structure that keeps the lenses in place using rims."

### iii. Supporting a pair of lenses

Plaintiffs construe the phrase "supporting a pair of lenses" to mean "holding the lenses in place, either by rims or some other retaining mechanism such as screws or pins." Defendant interprets the phrase to mean "holding the lenses in place using rims."

Read in the context of the claim language, it is obvious that the phrase "supporting a pair of lenses" is intended to describe a function of the "retaining mechanisms." Consistent with the above finding that "retaining mechanism" is a means-plus-function claim that is therefore limited

---

[12] The relevant claim language in *Phillips* at issue was as follows:
"Building modules adapted to fit together for construction of fire, sound and impact resistant security barriers and rooms for use in securing records and persons, comprising in combination, an outer shell . . . , sealant means . . . and further means disposed inside the shell for increasing its load bearing capacity comprising internal steel baffles extending inwardly from the steel shell walls."

[13] Once again, the parties relied in part on the testimony of outside experts and other sources in support of their interpretations of "retaining mechanism." Plaintiffs cited testimony from Richard Chao and Defendant pointed to the testimony of Mr. Leck. The court finds that this evidence is no more helpful in construing "retaining mechanism" than it is in construing "frame" and, as such, declines to reach any motions to exclude any and all of this evidence.

to the embodiments in the specification, the court finds that "supporting a pair of lenses" means "holding the lenses in place using rims."

### iv. Defining a frontal plane

Plaintiffs interpret the phrase "defining a frontal plane" to mean "delineating, by rims or other means, the plane of glasses parallel to the lenses." Defendant disagrees with Plaintiffs' construction, in part because it rejects the notion that pins or screws can define a "plane," because three points all in a common line cannot define a plane, as there are infinitely many planes that contain a straight line in three-dimensional space. Rather, Defendant insists that a plane is a surface with the property that any line joining two points on the surface is contained entirely within the plane.

The phrase "defining a frontal plane" also clearly describes a function of the "retaining mechanisms." As such, the court finds that "defining a frontal plane" means "delineating, by rims, the plane of glasses parallel to the lenses."

### v. Holding the two retaining mechanisms together

Plaintiffs interpret the phrase "holding the two retaining mechanisms together" to mean "supporting, or keeping from falling, the two parts that hold the lenses together, whether rims or other mechanisms such as screws or pins." Defendant, of course, offers its now familiar objections.

Consistent with its means-plus function finding, the court finds that the phrase "holding the two retaining mechanisms together" means "supporting, or keeping from falling, the rims together.

### vi. Two frames are attached together

Plaintiffs interpret the phrase "two frames are attached together" to mean "two eyeglasses, whether rimmed or rimless, and comprising the entirety of the auxiliary frame with the exception of the lenses and including the lens rims (if provided), the auxiliary frame magnetic members, the nose bridge, and the arms connected together as by way of a magnetic device."

Consistent with its above constructions, the court finds that the phrase "two frames are attached together" means "two eyeglass devices, which include, at least, a bridge and rims, are fastened or connected by magnetic attraction."

### vii. Not parallel to the frontal plane

Plaintiffs construe the phrase "not parallel to the frontal plane" to mean "not on the front portion of the bridge, but on the top and bottom of surfaces of the bridge, in some cases perpendicular to the frontal plane." Defendant interprets the phrase "not parallel" to mean, simply, that the planes do intersect and objects to limiting the phrase to encompass coupling only at "the top and bottom…surfaces of the bridge."

First, the court finds (and the parties appear not to contest) that "not parallel" means "substantially perpendicular." The language of Claim 2 states that "[a]n eyeglass device as

recited in claim 1 wherein the coupling occurs at a coupling surface on the second frame that is substantially perpendicular to the frontal plane." Therefore, "not parallel," read in the context of other relevant claim language, means "substantially perpendicular."

With respect to Plaintiffs' interpretation that coupling must be done "on the top and bottom of surfaces of the bridge," Defendant argues that, even if one of the non-parallel planes, such as the frontal plane, is vertically aligned, the other plane need not be horizontally aligned, and could in fact also be vertically aligned and still be substantially perpendicular. Defendant cites, as an example, a typical six-sided die; as Defendant points out, for any given side of a die, there are four sides that are perpendicular to it, two of which are horizontally aligned and two of which are vertically aligned. Therefore, Defendant contends, there is no basis for restricting the phrase "not parallel to the frontal plane" only to "the top and bottom of surfaces of the bridge."

The court agrees with Defendant. Plaintiffs cite prosecution history from the related '054 Patent as support for its interpretation, but the language Plaintiffs cite do not preclude Defendant's interpretation. Therefore, the court construes "not parallel to the frontal plane" to mean "substantially perpendicular to the frontal plane" without any limitation that coupling occur on the top and bottom of surfaces of the bridge.

### viii. U-shaped structure having two arms

Plaintiffs construe "U-shaped structure having two arms" as "a type of bridge, in the shape of the letter 'U', that receives the bridge of the frames to which it is attaching." Defendant intepets the same phrase to mean "a three-sided structure with two of the sides being generally parallel to one another." Defendant insists that the opening of the U-shaped structure need not be at the top and Plaintiffs do not voice any disagreement.

Consistent with these interpretations, the court construes the term to mean "a three-sided structure in the shape of the letter 'U', however oriented."

### ix. Sandwiched between

Plaintiffs interpret the phrase "sandwiched between" to mean "placed snugly in between the arms of the u-shaped bridge." Defendant, referring to a figure in the specification of the '811 Patent, insists that the bridge of the first frame need not be completely enclosed by the bridge. Rather, the arms of the U-shaped structure must simply extend over (and under) part of the bridge. Plaintiffs do not disagree that the U-shaped structure *may* extend over only part of the bridge, but disagrees to the extent Defendant is claiming that the U-shaped structure *must* extend over only part of the bridge.

The court agrees with Plaintiffs. Although the drawing Defendant cites does indicate that the U-shaped structure extends over only part of the bridge, the court finds no reason to limit the claim language to the specific embodiment discussed by Defendant. As such, the court construes "sandwiched between" to mean that the U-shaped structure "extends at least partially 'over' (and 'under') the bridge."

### 3. '896 Patent

#### i. Relevant Claim Language and Disputed Terms

**Claim 13:**

> An eyeglass device comprising: *a bridge configured to connect two retaining mechanisms[14] and hold them together*, with the two mechanisms for supporting a pair of lenses of a first frame and defining a frontal plane; and
> a magnetic member at the bridge for magnetically coupling to at least a part of the bridge of a second frame, so as to attach the two frames together;
> wherein:
> the magnetic member at the bridge of the first frame is enclosed by the bridge at least from the front to prevent the magnetic member from being visible from the front when the frame is being worn; and
> when the two frames are secured together, the magnetic member is coupled to the bridge of the second frame at a surface not parallel to the frontal plane.

#### ii. a bridge configured to connect two retaining mechanisms and hold them together

Plaintiffs construe the phrase "a bridge configured to connect two retaining mechanisms and hold them together" as "the middle section of eyeglasses, designed to connect the rims, pins, screws or other mechanisms for supporting the lenses." Defendant interprets the same phrase to mean "middle section of eyeglasses, designed to connect rims."

In light of the court's constructions of the terms "bridge" and "retaining mechanism," the court construes the above phrase as "the middle part of the eyeglasses spanning the nose designed to connect the rims."

### III. Conclusion

The court interprets the disputed terms in the Patents-in-Suit as described above.
It is so ordered.

Dated: White Plains, New York
September 9, 2005

*[signature]*
Stephen C. Robinson, U.S.D.J  9/9/05

---

[14] The actual claim language erroneously excluded the letter 's.' Here, the court will refer to retaining mechanisms in the plural form.